**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**SECURITIES AND EXCHANGE**
**COMMISSION,**

                                        **Plaintiff,**

                    -against-

**JUSTINAS BUTKUS, also known as "DARIUS**
**KARPAVICIUS," individually and doing**
**business as TBO CAPITAL GROUP and GRAY**
**CAPITAL GROUP;**
**HMC TRADING, LLC; and**
**HMC MANAGEMENT, LLC,**


                                        **Defendants,**
**and**

**DK AUTO, LLC,**

                              **Relief Defendant.**

**COMPLAINT**

**25-cv-1695**

**JURY TRIAL DEMANDED**

**COMPLAINT**

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC"), for its

Complaint against Defendants Justinas Butkus, also known as "Darius Karpavicius,"

(individually and doing business as TBO Capital Group and Gray Capital Group), HMC Trading,

LLC, HMC Management, LLC (collectively "Defendants") and Relief Defendant DK Auto,

LLC, alleges as follows:

**SUMMARY**

1.      From at least December 2021 through at least March 2023 (the "Relevant

Period"), Defendants engaged in a fraudulent scheme in which they raised approximately $4.1

million from dozens of investors by selling interests in mutual funds that did not actually exist.

1

2.      Defendants' scheme operated through websites for purported investment firms TBO Capital Group and Gray Capital Group.  Each website claimed its investment funds were managed by a cadre of experienced industry professionals whose pictures were prominently featured on the websites.  According to the websites, the investment funds had annual returns of 50+% since inception without a single down year.

3.      Although the websites were named for separate companies supposedly offering separate mutual funds, the names and pictures of three of the four managers on the two websites were identical.  The websites also listed the same company address and telephone numbers.  The graphics and layout on the website and fund descriptions were also near copies.

4.      TBO Capital Group, Gray Capital Group, and all of the industry professionals purportedly responsible for managing the respective investment funds were fictitious; not one of them actually existed.

5.      The investments sold by TBO Capital Group and offered by Gray Capital Group were fake, too, not a single security was purchased with investor funds.  Investors were instructed to send or wire money to accounts owned by HMC Trading, LLC or HMC Management, LLC, entities incorporated and controlled by Butkus, who sought to conceal his identity by using the alias, "Darius Karpavicius."  Butkus then transferred approximately 80 percent of those funds to accounts in the name of "Karpavicius" and HMC Trading's name at crypto asset trading platforms.  Butkus misappropriated the remaining funds for personal use and to perpetuate Defendants' fraud.

6.      By engaging in this conduct, Defendants violated, and unless enjoined, will continue to violate, Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act")

[15 U.S.C. § 77e(a) and (c) and 77q(a)]; Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [10 C.F.R. 240.10b-5].

7.     By this Complaint, the SEC seeks: (i) permanent injunctive relief; (ii)

disgorgement of ill-gotten gains with interest from Defendants and the Relief Defendant; and

(iii) civil penalties.

## JURISDICTION AND VENUE

8.     The SEC sues under Section 20(b) and 20(d) of the Securities Act [15 U.S.C. §§

77t(b) and 77t(d)] and Section 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and

78u(e)].

9.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v], and Section 21 and 27 of the Exchange Act [15

U.S.C. §§ 78u and 78aa].

10.     Defendants, directly and indirectly, have made use of the mails or the means or

instruments of interstate commerce in connection with the transactions, acts, practices, and

course of business alleged herein, by, among other means, soliciting investments via the internet

and accepting investor deposits via wire transfer.

11.     Venue is proper in the Southern District of New York pursuant to Section 22(a) of

the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Certain of the transactions, acts, practices and courses of business constituting the violations

alleged herein occurred within the Southern District of New York, and elsewhere, and were

effected, directly or indirectly, by use of the means or instruments or instrumentalities of

transportation or communications in interstate commerce, or of the mails.  As detailed below,

from at least December 2021, Defendants claimed their primary office was located at 244

3

Madison Avenue, #1149, New York, NY 10016.  Additionally, Defendants instructed certain investors to mail their investments to Defendants via paper check at this address, or to wire money to banks located in this district.

## DEFENDANTS

12.    Justinas Butkus, also known as "Darius Karpavicius," age 28, is a Lithuanian citizen who resides in the United States.  Butkus tried to conceal his identity by using a Lithuanian passport that was doctored such that it bore the name "Darius Karpavicius," but showed a photograph of Butkus.  Butkus engaged in the conduct described herein both individually and doing business as TBO Capital Group and Gray Capital Group.  Butkus, using his alias "Karpavicius," incorporated HMC Trading, LLC and HMC Management, LLC (the "HMC Defendants"), and Relief Defendant DK Auto, LLC.  He is the sole member of each entity.  Butkus, again using his alias "Karpavicius," opened bank accounts in the name of the HMC Defendants and Relief Defendant and oversaw and controlled the transferring of funds into and out of those accounts.  Through the HMC Defendants' bank accounts, Butkus purchased critical services used to operate Defendants' fraudulent scheme.  Butkus operated his fraud using the "Karpavicius" alias, the entity defendants, and by acting through two d/b/as:

    a.    TBO Capital Group was a fraudulent company through which Butkus did business, purportedly located at 244 Madison Avenue, #1149, New York, NY 10016 and on the internet at tbocapital.com.  TBO Capital Group claimed to be an employee-owned company and the sole manager of TBO Capital Healthcare Fund, purportedly a mutual fund.  TBO Capital Group did not really exist and has never been registered with the Commission in any capacity.

b. Gray Capital Group was a fraudulent company through which Butkus did business, purportedly located at 244 Madison Avenue, #1149, New York, NY 10016 and on the internet at graycapital.fund. Gray Capital Group claimed to be an employee-owned company and the sole manager of Gray Capital Healthcare Fund, purportedly a mutual fund. Gray Capital Group did not really exist and has never been registered with the Commission in any capacity.

13. HMC Trading, LLC ("HMC Trading") is a limited liability company incorporated by Butkus, using the alias "Karpavicius," in North Carolina on December 2, 2020. The formation documents for HMC Trading list its principal place of business as 11010 Lake Grove Blvd, Suite 100-123, Morrisville, NC 27560. That address is a private mailbox at a retail shipping store leased by Butkus under his alias, "Karpavicius." HMC Trading's bank accounts received investor funds through the fraud. Investors seeking to send their investment via wire or ACH transfer were instructed to transfer money to accounts in HMC Trading's name. Other investors made their investment via checks made out to HMC Trading. Investors were instructed to mail their checks to TBO Capital Group's New York address. That address is a private mailbox at a retail shipping store leased by Butkus under his alias, "Karpavicius." Butkus arranged to have mail received at that mailbox forwarded to his Morrisville, NC private mailbox. HMC Trading is Butkus's alter ego; it has no employees or infrastructure, was completely controlled by Butkus, and does not conduct any business separate from Defendants' fraud.

14. HMC Management, LLC ("HMC Management") is a limited liability company incorporated by Butkus, using his alias "Karpavicius," in South Carolina on March 22, 2022. Investors were instructed to transfer money to accounts in HMC Management's name via wire or ACH transfer. Other investors mailed their investment via check made out to HMC

Management.  HMC Management's bank accounts received investor funds through the fraud.
HMC Management is also Butkus's alter ego; it has no employees or infrastructure, was
completely controlled by Butkus, and does not conduct any business separate from Defendants'
fraud.

**RELIEF DEFENDANT**

15.     DK Auto, LLC ("DK Auto") is a limited liability company incorporated by
Butkus, using his alias "Karpavicius," in North Carolina on December 2, 2020.  DK Auto's
formation documents list its principal place of business as 11010 Lake Grove Blvd, Suite 100-
123, Morrisville, NC 27560.  That address is a private mailbox at a retail shipping store leased by
Butkus, under his alias, "Karpavicius,"  Funds were transferred from HMC Defendants' accounts
to accounts in DK Auto's name.

**FACTUAL ALLEGATIONS**

**A.  DEFENDANTS USED MATERIALLY FALSE AND MISLEADING
    STATEMENTS TO SOLICIT INVESTMENTS**

16.     From at least December 2021 through at least March 2023, Defendants have
solicited investors for non-existent mutual funds run by TBO Capital Group, and later Gray
Capital Group.  On or around September 19, 2022, TBO Capital Group's website was
deactivated, most email addresses at tbocapital.com were deleted, and phone calls to numbers
posted on the website went unanswered.  On or about this time, the website for Gray Capital
Group went active.

17.     In many respects, TBO Capital Group's and Gray Capital Group's websites are
duplicates.  The websites share similar layouts, graphics and logos as well as three of the same
purported fund managers.  The websites list the same New York address and phone numbers.
Both websites described the TBO Capital Group and Gray Capital Group employees as "highly

experienced portfolio managers who possess over 20 years of experience in the industry." Both websites describe the Group as being "employee-owned," with employees who "hold substantial personal capital" in the Group and whose "deferred cash compensation is directly linked to performance." In other locations, the websites claim that their "portfolio managers" have "25 years of experience working asset management."

18.    Defendants claimed TBO Capital Group was purportedly managed by four individuals: Andrew Taubman (CEO), Daniel Brown (CIO), David Freedman (Fund Manager) and John Olsen (FCFO). Images of the four purported executives were positioned above links to entirely fictitious biographies available on a prominent social media website.



19.    According to Defendants, TBO Capital Group's executives were also supported by "Long-tenured advisors of three PHDs and one MD in internal medicine."

20.    Gray Capital Group's website claimed that its fund is managed by three of the same four individuals purportedly managing TBO Capital Group, along with Alexandre Grande (Fund Manager). Again, the website featured the same photos of those purported executives.






21.    Both websites used the same graphics to illustrate performance: for example, identical graphs (TBO Capital on the left, Gray Capital on the right) illustrated the purported performance of their mutual funds in comparison to the "MSCI ACWI Health Care (Benchmark)."




22.    Defendants' websites contained numerous misrepresentations regarding the consistently high performance of their purported mutual funds.

23.    Although Defendants never made any investments, TBO Capital Group's and Gray Capital Group's websites falsely claimed that their mutual funds launched in 2015 and have since enjoyed a "50% + Average annual return for the last 5 years."  Both websites described the

mutual funds as "[o]ne of the Market's Most Effective Diversification Strategies," and claimed to "help-our clients achieve long-term positive returns on investments." The websites also described the purported mutual funds as "Industry-leading investment returns with a focus on risk management."

24.     TBO Capital Group's website also offered for download a seemingly detailed Annual Report, and a Fund Fact Sheet and Prospectus. According to the Annual Report, TBO Capital Group had $126,769,226.16 in assets under management as of December 2020. The Annual Report also included a breakdown of the mutual fund's allocation, including 35.4% in Biotechnology, 21.1% in Health Care Equipment and Supplies, and 18.1% in Pharmaceuticals. The Annual Report showed the mutual fund's entire portfolio as of December 31, 2020 and concluded with a fabricated "Report of Independent Registered Public Accounting Firm" from what appeared to be a legitimate accounting firm. The fake report stated: "[t]he financial statements, in our opinion, fairly represent the Fund's financial position, results of its operations, changes in net assets, and financial highlights of the periods audited in all material respects, in full accordance with the accounting standards required in the United States of America."

25.     Gray Capital Group's website claimed it had $150 million in total net assets. It also purported to list the portfolio composition of its mutual fund with 44.7% in crypto assets, 38.8% in Pharmaceuticals, and 20.3% in Biotechnology. The website also listed the mutual funds supposed top holdings, which include various crypto assets, prominent pharmaceutical companies, and other publicly traded companies.

26.     TBO Capital Group's website also promised the payment of monthly dividends, which could either be reinvested into an investor's account or paid out monthly. Gray Capital Group purported to offer daily, weekly, monthly, or yearly dividends.

27.     Defendants repeated similar materially false and misleading statements about the funds' assets and performance in internet advertisements and at least one press release, attempting to lure potential investors to the TBO Capital website.

28.     More specifically, between January and May 2022, Butkus paid a well-known technology company ("Company A") approximately $400,000 for online advertisements touting TBO Capital.  These advertisements included headlines such as "Best Returns Healthcare Fund," "Over 60% APY," and "Best Investment 2022," and directed internet users to TBO Capital's website.  Many TBO Capital investors learned of TBO Capital from these advertisements.

29.     Similarly, on February 14, 2022, in an apparent effort to drive more traffic to TBO Capital Group's website, Butkus created an account with a news distribution service to have a press release distributed across multiple digital media outlets announcing that TBO Capital Group was "reducing the fees on all investment balances starting from the 1st of March 2022."  The press release went on to falsely describe TBO Capital Group as having "25 years of industry experience, plus an average annual rate of return of 50% in the last five years." According to the press release, TBO Capital Group was managed by "highly experienced portfolio managers who possess over 20 years of experience in the industry."

## B.  BUTKUS OPERATED THE FRAUDULENT SCHEME

30.     TBO Capital Group's and Gray Capital Group's websites, through which Defendants perpetrated the fraud, provide the same phone numbers and street address. According to Defendants, TBO Capital Group and Gray Capital Group operated at the same address: 244 Madison Ave, Ste. 1149, New York, NY 10016.  While TBO Capital initially listed its phone numbers as (877) 839-3943 and (212) 710-5901, it later used the same numbers listed on the Gray Capital website:  (877) 839-3943 and (212) 796-6927.

10

31.    In reality, that address is a private mailbox at a retail shipping store at 244 Madison Avenue.  Butkus personally secured the lease for this mailbox using his alias, "Karpavicius," and a copy of his doctored Lithuanian passport.  He arranged for all mail received to be forward to a second mailbox he leased at 11010 Lake Grove Blvd, Suite 100-123, Morrisville, NC 27560.

32.    The (877) 839-3943 and (212) 710-5901 phone numbers were obtained by Butkus on or around December 2, 2021 from a company that provides toll free and phone forwarding services.  The account was initially opened under his alias, "Karpavicius," though in September 2022 he changed the account name to "kevin kevin."  Butkus paid for these phone services using one of the HMC Trading bank accounts he controlled.  On February 10, 2022, Butkus logged into this phone services account from IP address 107.15.119.123 ("Butkus IP address 1") to change the number to which calls were forwarded.  Butkus would later use this IP address to manage the fraudulent TBO Capital website and services supporting the website.

33.    On December 31, 2021, Butkus contacted Company A online to create the tbocapital.com email addresses pr@tbocapital.com, at 7:53:25 EST, and tbo@tbocapital.com, at 9:07:14 EST.  To create an email address, Company A required the user to provide their name, and Butkus provided his alias, "Karpavicius," to create both addresses.  Butkus created the pr@tbocapital.com email address from IP address 172.72.20.238 ("Butkus IP address 2").  Less than two hours after being used to create the pr@tbocapital.com email address, Butkus IP address 2 was used at 9:29:55 am EST to log into TBO Capital's account at the company hosting its website.  The tbo@tbocapital.com email account was also accessed from Butkus IP address 1 in March and April 2022.

34.     On or around January 13, 2022, using his tbo@tbocapital email account, Butkus created two accounts with Company A, an advertisement account and payment account.  Butkus used these accounts to post and pay nearly $400,000 for the internet advertisements described in paragraph 28 above.  Here, too, Butkus paid these bills using stolen investor funds held in one of the HMC Trading bank accounts he controlled.

35.     On or around January 19, 2022, using his pr@tbocapital.com email address, Butkus opened an account with a company that provided a service preventing internet bots from clicking on the TBO Capital internet ads described in paragraph 28.  Butkus paid for these services using one of the HMC Trading bank accounts he controlled and later accessed the account from Butkus IP address 2.

36.     Similarly, Butkus created the account for the February 14, 2022 press release described in paragraph 29, using his pr@tbocapital.com email address.  He paid for these services using stolen investor funds held in one of the HMC Trading bank accounts he controlled.

37.     TBO Capital Group's website also featured a chat window where potential investors could communicate with TBO Capital as they made their investment decisions.  Butkus used his pr@tbocapital.com email address to register for these services on or around February 22, 2022 and provided the credit card number he used to pay for the services using Butkus IP address 1.  As before, Butkus paid for the services using stolen investor funds from one of the HMC Trading bank accounts he controlled.  Through the means described above, Butkus engaged in the scheme to defraud investors both individually and by doing business as TBO Capital Group and Gray Capital Group.

C.  **DEFENDANTS USED THE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OTHER DECEPTIVE CONDUCT TO STEAL MILLIONS FOR BUTKUS'S PERSONAL BENEFIT AND TO CONCEAL THEIR MISCONDUCT**

38.     Defendants used the materially false and misleading statements outlined above to convince 64 retail investors to invest approximately $4.1 million in TBO Capital Group's purported fund.  The vast majority of these assets were stolen for Butkus's personal benefit while the remainder was used to perpetuate the fraudulent scheme.

39.     Prospective TBO Capital Group investors were instructed to first create an online account through the tbocapital.com website.  Once an investor's account was created, Defendants provided instructions to either send funds electronically to accounts in the name of HMC Trading or HMC Management, or to mail checks made out to those entities to TBO Capital's address in New York.  As noted, however, TBO Capital's address was actually Butkus's private mailbox at 244 Madison Ave, Ste. 1149, New York, NY 10016.

40.     To receive these investor assets, Butkus, using his alias "Karpavicius," opened – and solely controlled – each of the HMC Defendants' bank accounts.  More specifically, on each of March 23, 2021, March 24, 2021, March 30, 2021, November 5, 2021, and March 14, 2022, Butkus opened a bank account in the name of HMC Trading at five well-known banks.  Then, on April 15, 2022, Butkus opened an account for HMC Management with a sixth well-known bank.

41.     To create the appearance that the enterprise was legitimate and prevent investors from discovering their misconduct, Defendants deceptively fabricated online accounts for each TBO Capital investor.  The fake accounts purported to show the status of each investor's investment.  For those investors that requested to have their dividends reinvested, dividends appeared to accrue monthly in their online accounts.  These dividends were completely fake because there was no mutual fund and no actual investments that could generate any returns.

42.     For those investors that requested to have their dividends paid on a monthly basis, Defendants either mailed the investors dividend checks drawn on the HMC Defendants' bank accounts or wired them funds electronically from those accounts. In total, approximately 11 investors chose to receive monthly dividend payments and they received approximately $42,000 during the course of the scheme. Because Defendants did not actually operate any mutual funds, these dividend payments were actually *Ponzi*-like payments made from funds Defendants obtained from newer investors.

43.     The appearance, or receipt, of purported dividends prompted some investors to invest additional money and allowed Defendants' scheme to continue undiscovered.

44.     Ultimately, of the approximately $4.1 million invested, Defendants stole approximately $3.6 million for Butkus's personal benefit, including for groceries, restaurants, hotels, clothes, cash withdrawals, and crypto asset purchases. The cash withdrawals and crypto asset purchases, in particular, demonstrate that Butkus was the mastermind, and the primary beneficiary of, the fraudulent scheme.

45.     Butkus withdrew approximately $350,000 of the investors' funds in cash from various locations, including around the Morrisville, North Carolina area and Greer, South Carolina area. On August 18, 2022, a security camera in a bank in Rock Hill, South Carolina captured him depositing a check worth $21,500 of stolen investor funds into, and withdrawing $8,000 in cash from, his personal bank account. The image matches the photo in the doctored passport referenced in paragraph 31 above.



46.     Similarly, the crypto asset trading platforms Butkus used to spirit away his ill-gotten gains required him to provide a photograph of himself before completing his transactions. The redacted copy of one of these photos shown below matches the doctored passport photo and bank security image referenced in paragraphs 31 and 45, above, and also shows Butkus holding the doctored passport in his alias name, "Darius Karpavicius."



15

47.     On or about September 19, 2022, the TBO Capital Group website stopped working.  Calls to the phone numbers listed on the website went unanswered.  Email addresses listed on the website were deleted.  Investors lost access to their online TBO Capital Group accounts.

48.     In or around September 2022, the Gray Capital website became active and began offering securities to investors in an apparent attempt to continue the TBO Capital Group scheme.  In or around March 2023, the Gray Capital website was deactivated.

**D.  DEFENDANTS VIOLATED THE FEDERAL SECURITIES LAWS**

49.     The interests in the mutual fund offered and sold by the Defendants were securities within the meaning of the Securities Act and the Exchange Act. That the funds were fictitious does not change this fact.  The Defendants' statements to investors are what control this analysis and Defendants unmistakably – though falsely – offered the investors an investment in a security.

50.     The Defendants said they would pool the investors' assets into the Defendants' accounts and represented that they would invest those funds in interest in the purported mutual fund managed by TBO Capital Group and return a profit.  The Defendants further stated that TBO Capital Group and its employees' profits and earnings were directly tied to the performance of the TBO Capital Fund and thus tied to investors' fortunes.

51.     Investors considered the interests in the Defendants' mutual funds to be investments and were interested in the significant profits the funds were expected to generate that were touted by Defendants.

16

52.    Defendants engaged in the conduct described herein, including the offer and/or sale of the interests in the TBO Capital Group fund and the offer of interests in the Gray Capital Group mutual funds, by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, and/or by use of the mails.

53.    Defendants solicited investments from investors via the internet and secured investments from investors in multiple states through the instrumentalities of interstate commerce.

54.    Defendants did not register their sale of interests in the mutual fund with the Commission as required by Section 5 of the Securities Act and the sales were not otherwise exempt from registration.

55.    From at least December 2021 through at least March 2023, the Defendants engaged in a long-running course of conduct designed to deceive investors in the offer and/or sale, in connection with the purchase and/or sale, of interests in their purported mutual funds.

56.    The Defendants initiated the fraud by using false websites, fabricated press releases, a false identity and doctored passport, and opened bank accounts with the sole purpose of misappropriating investor funds.

57.    The Defendants employed several deceptive acts to make the transactions appear as legitimate investments, including by creating bogus online accounts where they pretended to deposit dividend returns and mailing and wiring dividend payments to investors drawn from funds invested by other investors.

58.    Butkus, and thus the entity Defendants he solely controlled, knowingly made materially untrue statements designed to deceive investors.  For instance, Defendants falsely represented the identities – and existence – of the executives purportedly managing TBO Capital

Group and Gray Capital Group, the business operations and performance of those entities, and the use of investor funds.

59.     A reasonable investor would consider material the misrepresentations and omissions described herein including, among other things, misrepresentations and omissions regarding the high rate of returns on investment and the use of investors' assets in deciding whether or not to purchase interests in Defendants' purported mutual funds.

60.     In connection with the fraudulent conduct described herein, Defendants acted knowingly or recklessly.  Butkus, and thus the entity defendants he solely controlled, knew or were reckless in not knowing, that they were making material misrepresentations.

61.     Similarly, Defendants knew or were reckless in not knowing, that investor funds were not being used as promised.

62.     Defendants used devices, schemes, and artifices to defraud investors, and engaged in acts, transactions, practices, or coursers of business that operated as a fraud or deceit upon investors.

63.     In addition to the numerous misrepresentations discussed herein, among other things, Defendants misled investors and misappropriated investors' funds for their personal use and benefit.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of Securities Act**
**(All Defendants)**

64.     The Commission re-alleges and incorporates by reference herein paragraphs 1 through 65.

65.     By virtue of the foregoing, without a registration statement in effect as to that security, Defendants, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

66.     By reason of the conduct described above, Defendants, directly or indirectly, violated and unless restrained and enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

### SECOND CLAIM FOR RELIEF
**Violation of Sections 17(a)(1), (2) and (3) of the Securities Act**
**(All Defendants)**

67.     The Commission re-alleges and incorporates by reference herein paragraphs 1 through 65.

68.    By reason of the conduct described above, Defendants, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting knowingly, recklessly, or, as to (ii) and (iii), negligently (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

69.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will continue to violate, Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)].

### THIRD CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) thereunder**
**(All Defendants)**

70.    The Commission re-alleges and incorporates by reference herein paragraphs 1 through 65.

71.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have employed one or more devices, schemes, or artifices to defraud.

72.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or

recklessly have engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

73.     By reason of the foregoing, Defendants directly or indirectly, singly or in concert, have violated and, unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

### FOURTH CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5(b) thereunder**
**(Defendant Butkus)**

74.     The Commission re-alleges and incorporates by reference herein paragraphs 1 through 65.

75.     Defendant Butkus, also known as "Darius Karpavicius," individually and doing business as TBO Capital, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. By reason of the foregoing, Defendant Butkus, directly or indirectly, singly or in concert, has violated and, unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Relief Defendant DK Auto, LLC)

76.    The Commission re-alleges and incorporates by reference herein paragraphs 1 through 65.

77.    DK Auto, LLC, received funds or assets, which are proceeds of the unlawful activity alleged above.

78.    DK Auto, LLC has no legitimate claims to such funds, assets, and/or property received and it is not just, equitable, or conscionable for the Relief Defendant to retain the funds.

79.    DK Auto, LLC was unjustly enriched as a result of Defendants' fraud and the Commission is entitled to an order, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. 78 § u(d)(5)], requiring DK Auto, LLC to disgorge all of the funds, assets or property it received from Defendants that were derived from the illegal activities described above.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### I.

### Finding of Liability

Finding the Defendants liable for the violations alleged herein.

### II.

### Injunction

In a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants, their agents, servants, employees, and

attorneys and all persons in active concert or participation with any of them from violating

Securities Act Sections 5(a) and (c) and 17(a) [15 U.S.C. §§77e(a) and (c) and 77q(a)], Exchange

Act Section 10(b) [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## III.

### **Disgorgement and Prejudgment Interest**

Ordering Defendants to disgorge on a joint and several basis the ill-gotten gains and/or

unjust enrichment they received directly or indirectly as a result of the violations alleged here

and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5)

and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)], and order Relief Defendant to

disgorge the ill-gotten gains and/or unjust enrichment it received, together with prejudgment

interest thereon.

## IV.

### **Civil Penalty**

Ordering Defendants to pay civil money penalties pursuant to Securities

Act Section 20(d) [15 U.S.C. § 77t(d)], and Exchange Act Section 21(d)(3) [15 U.S.C. §

78u(d)(3)]; and

## V.

### **Further Relief**

Granting any other and further relief this Court may deem just and proper for the benefit

of investors.

## VI.

## **Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby

demands a trial by jury on any and all issues in this action so triable.

Dated: February 27, 2025

Respectfully submitted,

_____/s/ Peter Lallas_____
Peter Lallas (PL-2965)
Katherine Stella (KS-1004)
Benjamin Vaughn (*pro hac vice* application forthcoming)
lallasp@sec.gov
stellak@sec.gov
vaughnb@sec.gov
(202) 551-6864 (Lallas)
(202) 551-2113 (Stella)
(202) 551-4848 (Vaughn)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F. Street, NE
Washington D.C. 20549